Hillsborough-southern judicial district
No. 2010-263

IN THE MATTER OF ERICA TAPPLY AND BENJAMIN ZUKATIS

Argued: April 7, 2010
Opinion Issued: August 11, 2011

*Katherine B. Stearns*, of Andover, by brief and orally, for the petitioner.

*Wilson, Bush, Durkin, & Keefe, P.C.*, of Nashua (*Timothy E. Bush* on the brief and orally), for the respondent.

DUGGAN, J. The petitioner, Erica Tapply, appeals an order of the Trial Court (*Lynn*, C.J.) denying her motion for judicial disqualification. The sole issue on appeal is whether the trial judge, who presided over this prolonged, contentious dispute concerning the parenting rights of the respondent, Benjamin Zukatis, erred by not granting Tapply's repeated requests to recuse himself. We affirm.

We begin with a recitation of the facts taken from hearing transcripts and court orders. In June 2003, Tapply and Zukatis met in Hudson and began dating. Tapply became pregnant shortly after the relationship began and their son, Z.Z., was born in 2004. Z.Z. is a special needs student with Pervasive Developmental Disorder, an autism spectrum condition, and Attention Deficit Hyperactivity Disorder.

Tapply was aware that in 2000, Zukatis had pleaded guilty to charges of aggravated felonious sexual assault in New Hampshire, and kidnapping, indecent assault and battery, assault and battery, and unauthorized use of a motor vehicle in Massachusetts. He served eight months in jail and also received a deferred sentence and probation. He was ordered to enter a substance abuse treatment program, to continue in counseling, and was prohibited from having any contact with the victim, who at the time was his girlfriend. Zukatis was also required to register as a sex offender in Massachusetts. Tapply and Zukatis dated on and off until 2005 when they ended their relationship.

On July 8, 2005, Tapply filed a domestic violence petition against Zukatis and obtained a temporary restraining order preventing Zukatis from having contact with her or Z.Z. The basis for her petition was that on July 7, 2005, Tapply brought Z.Z. to his pediatrician, informed the doctor that Zukatis was a convicted sex offender, and reported her concern that six to nine months earlier, Z.Z. had experienced redness around his penis that may have been indicative of sexual abuse by Zukatis. The pediatrician reported Tapply's allegations to the New Hampshire Division for Children, Youth & Families (DCYF), but did not make a determination of sexual assault. DCYF "screened out," or dismissed, the complaint because the pediatrician had found no evidence of abuse. Following a final hearing, the Merrimack District Court (Kinghorn, J.) denied the domestic violence petition.

Also on July 7, 2005, Tapply went to the Merrimack Police Department to express her concerns that Zukatis may have molested Z.Z. The police interviewed Tapply, her father, Z.Z.'s pediatrician, and Zukatis, but closed the investigation in August 2005 without taking any further action.

In August 2005, Tapply filed a petition for custody and support, which is the underlying action in this case. Following a hearing, the Trial Court (Hampsey, J.) appointed a Guardian Ad Litem (GAL) and entered a temporary order awarding Tapply sole decision-making and residential responsibility for Z.Z. and prohibiting Zukatis from having any parenting time pending a report from the GAL. After receiving the GAL's preliminary report, the court approved a stipulation proposed by the GAL that Zukatis be evaluated by a forensic psychologist and then be allowed one hour of supervised parenting time per week. The psychologist's report indicated that neither Zukatis's probation officer nor his counselor believed that he posed any threat to Z.Z. and that Zukatis "appeared to be making progress in dealing with his issues." Following a series of tests, the psychologist recommended that Zukatis be limited to having supervised visits with Z.Z., that such visits should continue for at least one year, and that the court should obtain input from the visitation supervisor and Zukatis's and Z.Z.'s therapists before expanding Zukatis's visitation rights.

In October 2006, Zukatis began weekly supervised visits with Z.Z., which continued through March 2008. Judge Lynn found that Zukatis interacted appropriately with Z.Z. during these visits and that Z.Z. never showed any signs of reluctance when with Zukatis.

During this period of weekly visits, Judge Lynn granted Zukatis's motion allowing him to give Z.Z. a toy truck as a Christmas gift. The truck was delivered to Tapply but she never gave it to Z.Z. because she felt it was "a presence of [Zukatis] at [her] house and that's too upsetting." Tapply contended that she never gave Z.Z. the truck because she was following the

policy of the Greater Nashua Supervised Visitation Center and that Zukatis could not usurp the Visitation Center rules by obtaining a court order. Judge Lynn later admonished Tapply for disregarding an order of the court.

In October 2007, Tapply filed a "Motion to Continue Trial and to Temporarily Suspend Parenting Time for Medical Purposes." Tapply alleged that Z.Z. was having speech and behavioral issues that became worse after he spent time with Zukatis. Tapply proposed an eight-to-twelve week suspension of supervised visits to determine whether Zukatis was the cause of Z.Z.'s regression. The GAL supported Tapply's motion and the Trial Court (*Groff*, J.) agreed to postpone the trial and schedule an evidentiary hearing on the request to suspend visitation.

In January 2008, Judge Lynn held an evidentiary hearing, but by that time Tapply no longer sought to suspend the visits. Instead, she requested that a trained therapist monitor the supervised visits to determine whether they were causing harm to Z.Z. Judge Lynn denied the relief requested and ordered that Zukatis's parenting time with Z.Z. be gradually expanded and that the visits be supervised by one of Zukatis's parents.

Beginning in March 2008, Zukatis had parenting time with Z.Z. that was supervised by one or both of Zukatis's parents. After the first two visits, Tapply refused to bring Z.Z. for a third visit, later indicating to the Visitation Center Coordinator that Z.Z. had had an anxiety attack on his way to the visit. Zukatis filed a motion for contempt and, following a hearing, Judge Lynn concluded that Tapply had "no justifiable excuse for failing to produce [Z.Z.] for his scheduled visit with [Zukatis]." Judge Lynn found that Z.Z. appeared to enjoy the time he spent with Zukatis and his paternal grandparents.

On May 7, 2008, at Tapply's urging, Z.Z.'s speech therapist contacted DCYF to report her concerns that Z.Z. was having "unsupervised" visits with a "level 2 sex offender" with "a history of mental illness" and who "was suspected of abusing [Z.Z.] at age 1." Judge Lynn later noted that it was clear from the therapist's report that she was relying upon information provided by Tapply. On the same date, Tapply also made a complaint to DCYF with concerns that Zukatis had abused Z.Z. DCYF initially concluded that there was insufficient information to open an investigation into these allegations of abuse. However, after Tapply complained to DCYF headquarters in Concord, the agency reopened the case.

On June 17, 2008, following a mid-week visit with Zukatis, Tapply noticed that Z.Z.'s anal area was red and irritated. When Tapply asked Z.Z. what happened, he allegedly said, "I'm not telling." Tapply took a photograph of the area. Tapply brought Z.Z. to the hospital the next day and informed the doctor that she had noticed a similar rash on two other occasions and

believed that Zukatis had molested Z.Z. Z.Z. denied any abuse or trauma to the doctor and the medical findings were inconclusive for abuse.

Tapply also reported the incident to the Merrimack, Nashua, and Lowell Police Departments and to DCYF. Tapply had Z.Z. examined again at Southern New Hampshire Medical Center, but again there was no finding that the irritation was indicative of abuse. Tapply had Z.Z. examined for a third time at Dartmouth-Hitchcock Medical Center in Nashua, and again the exam was inconclusive for abuse; however, the examining doctor expressed concern at Z.Z.'s silence when asked if "his bum or his pee-pee were hurting."

Tapply also reported the June 17 incident to the GAL. The GAL filed an *ex parte* motion to suspend Zukatis's parenting time with Z.Z. The motion was granted, but, after a further hearing, the Trial Court (*Nicolosi*, J.) reinstated supervised visits between Zukatis and Z.Z. at the Nashua Visitation Center. Z.Z. was then interviewed at the Child Advocacy Center (CAC) and made no disclosures of abuse.

Upon the recommendation of DCYF, Z.Z. began treatment with a licensed mental health counselor, Michelle Boutin. Boutin met with Z.Z. in August 2008 after being provided with background information by Tapply concerning herself, Zukatis, and Z.Z. Boutin acknowledged that from the beginning of her counseling and continuing through November 2008, the entire purpose of her seeing Z.Z. "was to help him feel comfortable to express himself so that he would be encouraged to make a disclosure of the sexual abuse to which he had been subjected by [Zukatis]." Judge Lynn later found that it was clear from Boutin's testimony and reports that her treatment regimen proceeded on the assumption that Z.Z. had in fact been abused by his father and that her task was to get Z.Z. to acknowledge this fact. Judge Lynn concluded that Boutin gave no serious consideration to the possibility that the information she received from Tapply might have been inaccurate or biased, or that Zukatis had not actually abused Z.Z.

Judge Lynn acknowledged that Boutin offered testimony that on several occasions, in response to questions, Z.Z. made negative statements about Zukatis. Judge Lynn weighed these statements against the other evidence, including consistent third-party observations of positive interactions between Z.Z. and Zukatis, Boutin's reports on Z.Z.'s improving behavior, and the testimony of Zukatis and his father, and found that any negative comments from Z.Z. did not reflect his actual feelings toward his father and were not probative of abuse by Zukatis.

Tapply next alleged that on August 26, 2008, while watching television, Z.Z. said, "penis on your bum." Tapply asked him if "someone put a penis on [his] bum" and he said "yes." Tapply asked Z.Z. to "draw a picture of who put a penis on his bum" and Z.Z. drew a stick figure that appeared to have

a penis. Tapply asked who the picture was of and Z.Z. stated, "daddy." Tapply asked if "daddy put a penis on your bum," and Z.Z. said, "yes, he put it in my bum, he put it in my mouth, he spit it at me." Z.Z. never repeated these allegations to a third party and Judge Lynn later found that Tapply's testimony was not credible on this point. Judge Lynn was not persuaded that Z.Z. made the statements at all or "that if he did so, [that] the statements (and the picture) reflect reality."

Tapply reported the August 26 disclosures to Boutin and DCYF, and urged DCYF to continue its investigation and to schedule a second interview with Z.Z. at the CAC. DCYF declined to conduct a second interview because Z.Z. was already being seen regularly by Boutin. In November 2008, DCYF again closed its investigation of Zukatis with a determination that Tapply's allegations of abuse were unfounded.

On January 13, 2009, Tapply filed a motion to recuse Judge Lynn from the case. Tapply argued that Judge Lynn had noted in his January 5, 2009 order that there was "cause to view [Tapply]'s latest allegations against [Zukatis] critically," and that during the status conference in December 2008, he stated that he was "skeptical" of Tapply. Tapply felt that these statements demonstrated a bias against her. Judge Lynn subsequently denied the motion.

At the final hearing on the custody and support petition held in March 2009, Zukatis testified that he had never abused Z.Z. and that he had no sexual desire for, or interest in, young boys. Both Zukatis and his father testified that during every visit with Z.Z., at least one of Zukatis's parents was present throughout the visit. Zukatis testified that Z.Z. never took his clothes off during the visits and never said anything referring to "bums" or "butts." In regard to Z.Z.'s visit on June 17, 2008, Zukatis testified that he took Z.Z. to his apartment in Lowell and that at least one of his parents was present throughout the visit. He also testified that Z.Z. "did not have a bowel movement during the visit" and "had no occasion to take down his pants."

In the final order on the petition for custody and support, issued in May 2009, Judge Lynn considered all rationales offered by the GAL and Michelle Boutin for suspending the visits between Z.Z. and Zukatis and ultimately concluded that it was in Z.Z.'s best interest to be restored to a normal relationship with Zukatis as soon as possible. Judge Lynn entered a six-month parenting plan and scheduled a review hearing, after which the court would enter a long-term parenting plan. He concluded that under the temporary six-month parenting plan, it would be best not to grant joint decision-making responsibility or unsupervised visits to Zukatis. Under the plan, Zukatis's visits would gradually expand until, for the final ninety days, he would have visits on both Saturday and Sunday every other weekend.

The order also required one of Zukatis's parents to be present for all visits. The order required Zukatis to continue to attend counseling and Tapply to see a qualified mental health counselor to deal with her anger toward Zukatis and with the fact that she must share parenting responsibilities. Judge Lynn ordered Z.Z. to see a new counselor in order to give a "fresh start" with a counselor with unbiased views of the parties.

Following the May 2009 order of the court, Z.Z. began meeting with a new counselor, Rebecca Partridge. Partridge indicated that on September 3, 2009, Z.Z. said, "daddy hit me." Partridge reported this to DCYF, but the agency did not take any action and Partridge did not recommend that the court take any action as a result of the statement. Judge Lynn found that whatever the basis for Z.Z.'s statement, it was not indicative of any inappropriate conduct by Zukatis. Partridge noted that during her next session with Z.Z., he said that Zukatis was his "best friend."

On September 4, 2009, Tapply filed a grievance with the Judicial Conduct Committee (JCC) alleging bias and prejudice against her by Judge Lynn; that Judge Lynn failed to recuse himself from the case following Tapply's motion to recuse; that Judge Lynn "committed multiple instances of erroneous and/or egregious legal error . . . which demonstrates he has not maintained professional competence in the law"; that Judge Lynn denied her the "basic and fundamental right to be fully heard according to the law"; that Judge Lynn showed disrespect toward her and others involved in the case; and that Judge Lynn failed to assure a prompt, efficient, or fair disposition of the matter or assure proper performance of himself and those under his supervision.

On September 23, 2009, following a mid-week visit with Zukatis, Tapply found Z.Z. curled up in a fetal position in the bathroom. Z.Z. had some redness around his anus. Tapply alleged that Z.Z. stated, "Daddy is the boss." Tapply contacted her attorney, took a photograph of Z.Z.'s anus, and brought him to the hospital. The hospital made a finding that Z.Z.'s anus was "minimally erythematous," meaning "abnormal redness of the skin due to capillary congestion (as in inflammation)," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 773 (unabridged ed. 2002), and diagnosed Z.Z. with an "alleged sexual assault." Later that evening Tapply spoke with a Nashua police officer who had been dispatched to the hospital. The officer's report indicates that Tapply told the officer that she believed Z.Z. had been sexually assaulted by Zukatis, but at a later hearing Tapply denied telling the officer this. On September 25, 2009, Tapply filed an *ex parte* motion to suspend Zukatis's parenting time based upon the alleged incident of sexual assault. The Trial Court (*Barry*, J.) granted the petition and scheduled a hearing.

Judge Lynn presided at the hearing. At the beginning of the hearing, Tapply made an oral motion to recuse Judge Lynn, which he denied. Judge Lynn heard testimony from Tapply, a DCYF case worker, and Zukatis's mother. The DCYF case worker testified that DCYF had opened an investigation based upon Tapply's allegations involving the September 23 incident and stated that they had scheduled another interview with Z.Z. at the CAC. Zukatis's mother testified that she and her husband were present for the entire visit with Z.Z. on September 23, that Z.Z. and Zukatis were never alone, and that Zukatis did not abuse Z.Z. or engage in any inappropriate conduct during the visit. She also produced a packet of time and activity logs, which she had begun keeping during Zukatis's parenting time with Z.Z. in order to guard against Tapply's accusations of abuse. At the conclusion of the hearing, Judge Lynn found that there was "no credible evidence" that Zukatis had abused Z.Z. on September 23 and that Tapply had acted "unreasonably" in lodging her allegations of abuse without making any serious effort to speak with Zukatis's parents before doing so. Judge Lynn vacated the *ex parte* order of September 25 and reinstated Zukatis's parenting time along with an extra weekend to make up for a missed visit.

On October 6, 2009, Tapply filed a motion seeking to disqualify Judge Lynn and have his final order vacated. She argued that at the September 29, 2009 hearing, Judge Lynn went on "a judicial tirade" and that his impartiality could be reasonably questioned in the case, requiring disqualification. Judge Lynn denied the motion on October 26, 2009.

On October 6, Tapply filed a second grievance with the JCC, renewing her earlier complaints against Judge Lynn and supplementing her prior grievance with additional allegations of misconduct. On the same day, Tapply's attorney also filed a grievance against Judge Lynn with the JCC. The grievance also charged that Judge Lynn engaged in a "tirade" and that he "did NOT listen to any of the evidence and decided before hand [*sic*] that [Tapply] is a horrible person for bringing her son to the hospital." Tapply's attorney also alleged that Judge Lynn was colluding with Zukatis's attorney, which, she concluded "could be as simple as a complete and total disregard of women." She further alleged that Judge Lynn did not maintain professional competence in the law, that he was not patient, dignified, and courteous to Tapply, and that he demonstrated bias and prejudice against Tapply.

On October 25, 2009, Tapply again brought Z.Z. to the emergency room with a complaint of possible child abuse. The basis for the complaint was again redness around Z.Z.'s anus and redness on his inner thigh with several puncture-type lesions that she had discovered four days earlier. Z.Z. did not say anything to indicate that any abuse caused the redness.

The hospital made a clinical finding of "suspected child abuse," which Judge Lynn found was based upon Tapply's assertion to hospital staff that "there is an established history of similar problems in past visitations [with Zukatis]." The hospital notified the Merrimack, Nashua and Lowell police departments, but none of the law enforcement agencies took any action against Zukatis.

On October 26, Tapply took Z.Z. to see Dr. Liliane Sznycer, who performs examinations for the hospital. Her office note indicates that she was "unable to differentiate from insect bites versus inflicted puncture or injury wounds" and that Z.Z. had "very mild perianal erythema which is entirely nonspecific and does not rule out the possibility of sexual molestation."

The JCC met on November 13, 2009, and voted to dismiss the two grievances filed by Tapply and the grievance filed by Tapply's lawyer. The JCC found that the grievances related to rulings of the court "otherwise subject to appeal" and, thus, were beyond its jurisdiction. Following the dismissal of the grievances, the JCC sent Judge Lynn a letter expressing concern with the "strident tone taken by the Court in questioning Ms. Tapply and in issuing its final conclusions, as well as entering into a debate with [Tapply's attorney] after the conclusion of the hearing."

On December 8, 2009, Tapply's attorney wrote to the JCC requesting that it reconsider its decision to dismiss the grievances. The JCC decided to allow Judge Lynn to respond to the attorney's letter. The JCC noted that it was only concerned with Judge Lynn's demeanor at the September 29, 2009 hearing and that it had already determined that all other matters were rulings of the court.

On January 26, 2010, Judge Lynn issued an order following a review hearing on the case and found that Zukatis "at all times conducted himself properly and appropriately during his parenting time with [Z.Z.], and that the time [Zukatis and Z.Z.] have spent together has been beneficial to both individuals." Judge Lynn ordered Zukatis's parenting time to be increased, granted both parents joint decision-making responsibility, allowed Z.Z. to have overnight visits with Zukatis, and ruled that it was no longer necessary to require Zukatis's parents to supervise the visits. The order also awarded Zukatis attorney's fees for the September 29, 2009 *ex parte* hearing involving Tapply's accusations of sexual assault by Zukatis against Z.Z.

On January 26, 2010, Tapply's attorney filed another grievance with the JCC, alleging that in the wake of the "letter of caution" issued by the JCC, Judge Lynn should have recused himself due to the "appearance of impartiality," and that he failed to disclose to all parties the letter of caution and his correspondence with the JCC. On February 5, 2010, Tapply's

attorney filed another grievance with the JCC, raising concerns about alleged *ex parte* communications involving Judge Lynn regarding the orders in the case.

On February 8, 2010, Judge Lynn responded to the JCC regarding the allegations made by Tapply and her attorney. He denied that he engaged in a "judicial tirade" or that he "yelled and screamed" during the September 29, 2009 hearing. Judge Lynn acknowledged to the JCC that he spoke in a stern tone when making his findings because he felt it necessary to "admonish Ms. Tapply for what [he] found to be clearly unreasonable behavior on her part." He also pointed the JCC to allegations by Tapply's attorney that there was collusion between himself and Zukatis's attorney and that the supreme court had declined to accept Tapply's appeal "due to political pressures among the judiciary," as evidence that her characterization of the hearing may not have been completely accurate.

At its meeting on February 12, 2010, the JCC "decided not to further clarify, reconsider, or otherwise take any further action" with respect to the grievances filed by Tapply and her attorney. On March 31, 2010, Tapply's attorney amended her last grievance and added two alleged violations relating to the *ex parte* communications. The JCC dismissed her final grievance on April 9, 2010, finding no judicial misconduct.

On February 7, 2010, Tapply filed a motion for "judicial disqualification," again claiming bias on the part of Judge Lynn and raising concerns about alleged *ex parte* communications. The court denied the motion in a lengthy order. This appeal followed.

I

Tapply first argues that Judge Lynn should have granted her motion to recuse or disqualify himself because his impartiality could reasonably be questioned. Tapply points to four instances that she alleges raise questions of Judge Lynn's impartiality: (1) that he received a "letter of caution" from the Judicial Conduct Committee; (2) that he had several *ex parte* communications without disclosing them to the parties; (3) that his decisions in the case and his letter to the Judicial Conduct Committee evince a personal hostility toward Tapply and her attorney; and (4) that several news media outlets reported on the "letter of caution" that Judge Lynn received.

■ "It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." N.H. CONST. pt. I, art. 35. The New Hampshire Code of Judicial Conduct requires a judge to disqualify himself or herself in a proceeding in which his impartiality might reasonably be questioned, including, but not limited to instances where "the judge has a personal bias or prejudice concerning a party or a party's lawyer." SUP. CT.

R. 38, Canon 3E(1)(a) (amended 2011). "The party claiming bias must show the existence of bias, the likelihood of bias, or an appearance of such bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of a party." *State v. Hall*, 152 N.H. 374, 377 (2005). "The test for the appearance of partiality is an objective one, that is, whether an objective, disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case." *Miller v. Blackden*, 154 N.H. 448, 456 (2006) (quotation omitted).

■ "Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *State v. Bader*, 148 N.H. 265, 271 (2002) (quotation and brackets omitted). "Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* (quotation and brackets omitted). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* (quotation omitted).

Tapply argues that Judge Lynn's impartiality could reasonably be questioned when he received a "letter of caution" from the Judicial Conduct Committee. The letter dismissed the grievances against Judge Lynn filed by Tapply and her lawyer, but expressed concern "with the rather strident tone taken by the Court in questioning Ms. Tapply and in issuing its final conclusions, as well as entering into a debate with [Tapply's attorney] after the conclusion of the hearing." The committee said that "a temperate response is more in keeping with expected judicial demeanor in the courtroom."

Zukatis argues that the JCC had no authority to issue the letter of caution and that we should not consider it. Supreme Court Rule 40 provides the procedural rules for the JCC in dealing with a grievance filed against a judge. If the JCC finds that a grievance meets certain requirements, the grievance is to be docketed as a complaint. *See* SUP. CT. R. 40(5)(c). If a grievance relates to a judge's findings, rulings, or decision, which, in effect, is a substitute for an appeal, it cannot be considered by the JCC. SUP. CT. R. 40(5)(c)(1)(a). If the JCC dockets the grievance as a complaint, the judge is given notice of the complaint, given an opportunity to respond to the complaint, and, upon a finding of probable cause to warrant formal proceedings and the preparation of a formal statement of charges, provided with a formal hearing. SUP. CT. R. 40(7), (8), (9), (11). If the committee then determines that there has been no violation of the Code of Judicial

Conduct, the proceeding shall be dismissed, with or without a warning. *See* SUP. CT. R. 40(12)(b). If the committee determines that there is a violation of the Code of Judicial Conduct but not of a sufficiently serious nature to warrant formal discipline by the supreme court, the JCC may dispose of the matter through informal resolution, which may include admonishing the judge, issuing a reprimand, requiring corrective action, or other similar remedial action. SUP. CT. R. 40(12)(c).

Here, the JCC determined that the grievances filed by Tapply and her attorney related to "ruling(s) of the Court otherwise subject to appeal," and, thus, could not be considered by the committee. *See* SUP. CT. R. 40(5)(c)(1)(a). The JCC never docketed any of the grievances as a complaint. While this should have concluded the matter, the JCC admonished Judge Lynn in its letter dismissing the grievances. This was beyond the authority of the committee. The procedures provided by Rule 40 clearly establish that a grievance must be docketed as a complaint prior to the JCC taking any action against a judge, whether it be disciplinary or non-disciplinary, as in the case of the warning issued in the letter from the JCC. *See* SUP. CT. R. 40(2) (defining a "warning" as "[n]on-disciplinary action taken by the committee when it is believed that a judge acted in a manner which involved behavior requiring attention although not constituting clear violation of the Code of Judicial Conduct warranting disciplinary action"). Because the grievance was dismissed and not docketed as a complaint, the JCC lacked the authority to issue the "letter of caution" to Judge Lynn.

Even were we to find that the JCC had the authority to issue a letter of caution, we do not find that the letter required recusal. While the letter may have expressed concern over the tone used by Judge Lynn, the letter expressed no concerns as to his partiality. Because judicial remarks that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," *Bader*, 148 N.H. at 271 (quotation omitted), we do not find that the letter of caution, without more than a concern over the judge's tone, would cause an objective, disinterested observer, fully informed of the facts, to entertain significant doubt that justice would be done in the case. *See Blackden*, 154 N.H. at 456.

Tapply next argues that Judge Lynn's impartiality could reasonably be questioned because he "had several *ex parte* communications without disclosing such to the tribunal." Tapply's brief and argument make clear that her concern centers around the written communications between Judge Lynn and the JCC. Tapply argues that when the parties appeared for a review hearing on January 12, 2010, Judge Lynn had an obligation to inform the parties that grievances had been filed against him, that he had

received a letter of caution from the JCC, and that he intended to respond to the JCC regarding the allegations in the grievances.

■ Tapply acknowledges that at the time of the review hearing she was aware that grievances had been filed against Judge Lynn, having filed two of the grievances herself and her lawyer having filed the third. Nonetheless, she contends that Judge Lynn should have disclosed the correspondence with the JCC to Zukatis at the hearing and that his failure to do so requires recusal. The fact that Judge Lynn did not inform Zukatis of the grievances filed by Tapply fails to establish any appearance of bias against Tapply or call into question his impartiality in any way. Since it was Tapply, and not Zukatis, who filed the motion to recuse, it is irrelevant whether Zukatis was informed of the JCC communications.

Tapply next argues that Judge Lynn's impartiality could reasonably be questioned because he had a "personal hostility toward [Tapply] (and her attorney) evidenced by a six page letter to the New Hampshire Judicial Conduct Committee, as well as his decisions in the case." She contends that the rulings display a deep-seated favoritism or antagonism that made fair judgment impossible. She further argues that the orders of the court were not reflective of the record in the case.

■ We first address the letter that Judge Lynn sent to the JCC responding to concerns about his demeanor at the September 29, 2009 hearing. Again, "[t]he party claiming bias must show the existence of bias, the likelihood of bias, or an appearance of such bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of a party." *Hall*, 152 N.H. at 377. Whether an appearance of impropriety exists is determined under an objective standard. *Id.*

■ After reviewing Judge Lynn's letter to the JCC, we conclude that, objectively viewed, no reasonable person would have determined that Judge Lynn was prejudiced or biased against either Tapply or her attorney. The letter provides a brief background of the issues involved in the case, all of which was contained in the court's May 26, 2009 final order. Judge Lynn noted that he did ask Tapply a series of follow up questions during her testimony, but only because she did not provide direct answers to the court's initial questions. Judge Lynn acknowledged speaking in a stern tone while making findings and rulings on the record but denied that it was particularly aggressive or strident. He said that it was necessary to admonish Tapply for what he found to be clearly unreasonable behavior and then provided a detailed description of the reasons why he felt her behavior was unreasonable. As we have already established, "judicial remarks . . . that are critical or disapproving of, or even hostile to, counsel, the parties,

or their cases, ordinarily do not support a bias or partiality challenge." *Bader*, 148 N.H. at 271 (quotation omitted). Nothing in the letter to the JCC even remotely suggests the deep-seated favoritism or antagonism alleged by Tapply.

 We next address the court's rulings in the case. After a thorough review of all of the transcripts and rulings in the case, we conclude that objectively viewed, no reasonable person would have determined that the trial court was prejudiced or biased against either Tapply or her attorney. There are certainly instances in the record where Judge Lynn admonished Tapply, but these were always accompanied by specific, detailed reasons related to particular events in the case. Tapply raises concern with Judge Lynn's comments that he was "skeptical" of Tapply before the final hearing had been held. The United States Court of Appeals for the Second Circuit has aptly noted that

> it is [a judge's] duty, while listening to and watching [witnesses], to form attitudes towards them. He must do his best to ascertain their motives, their biases, their dominating passions and interests, for only so can he judge of the accuracy of their narrations. He must also shrewdly observe the strategems of the opposing lawyers, perceive their efforts to sway him by appeals to his predilections. He must cannily penetrate through the surface of their remarks to their real purposes and motives. He has an official obligation to become prejudiced in that sense. Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions.

*In re J. P. Linahan*, 138 F.2d 650, 654 (2d Cir. 1943).

When Judge Lynn noted that he was skeptical of claims made by Tapply, he was merely fulfilling his duty as the finder of fact. Judge Lynn provided detailed reasoning for his skepticism, which was supported by the record before him. For example, Judge Lynn found that Tapply had a history of making allegations of sexual abuse against Zukatis, only to have DCYF and the investigating police departments drop the case due to a lack of evidence. In regard to the September 2009 allegation, Judge Lynn found that Zukatis was never alone with Z.Z., consistent with an order of the court, and there was no reason for Tapply to reasonably believe that Zukatis's parents had not supervised the September 2009 visit. We find nothing in the rulings of the court to suggest a personal bias or partiality against Tapply or her attorney.

Tapply also argues that several of the court's orders are "not reflective of the record." It appears that her primary concern is that at the final hearing in March 2009, Tapply called several witnesses and introduced numerous exhibits, mostly uncontradicted by Zukatis. She argues that Judge Lynn ignored all of the professional recommendations presented at the hearing.

■ "The trier of fact is in the best position to measure the persuasiveness and credibility of evidence and is not compelled to believe even uncontroverted evidence." *Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 711 (1986). After a thorough review of the transcript and the order, it is clear that Judge Lynn rejected the testimony because he found it to be lacking in credibility, and not based upon some bias against Tapply and her attorney. We cannot say that Judge Lynn erred in rejecting the testimony and evidence presented by Tapply, even if such evidence was uncontradicted.

Tapply further contends that Judge Lynn's impartiality could reasonably be questioned when "the 'letter of caution' [he] received appeared in many media outlets while the matter was pending." Tapply argues that when the *Manchester Union Leader* published an article reporting on the "letter of caution," her motion for judicial disqualification and motion for reconsideration were still pending. She contends that an objective observer would reasonably question his impartiality after reading the article in the newspaper.

■ ■ Recognizing that the test for partiality is objective and asks whether a "disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case," *Blackden*, 154 N.H. at 456 (quotation omitted), we do not find that the media reports regarding the letter of caution would cause an objective observer to reasonably question Judge Lynn's impartiality. The news article reported that the JCC dismissed the grievances alleging bias and discrimination filed by Tapply and her attorney. The article reported that the JCC was concerned about Judge Lynn's tone on the bench and also reported on the events of the custody case. We have already determined that the letter of caution itself would not cause an objective observer to reasonably question the trial judge's impartiality, and Tapply fails to explain why a news media outlet report on the letter would lead to a different result.

## II

Tapply next argues that Judge Lynn applied the wrong standard for judicial recusal or disqualification in denying her motion for judicial disqualification. Tapply contends that the law in this state requires an

objective standard while Judge Lynn applied a subjective standard. Tapply points to Judge Lynn's order in which he stated, "In summary, the court reiterates that it holds no subjective personal bias or prejudice against petitioner or her counsel and would recuse itself *sua sponte* if the court felt otherwise."

The Code of Judicial Conduct requires a judge to disqualify himself in a proceeding where the judge's impartiality might reasonably be questioned and to avoid even the appearance of impropriety. *See* SUP. CT. R. 38, Canon 3E(1); *see also State v. Belyea*, 160 N.H. 298, 303 (2010). "The existence of an appearance of impropriety is determined by an objective standard, *i.e.*, would a reasonable person, not the judge himself, question the impartiality of the court." *Belyea*, 160 N.H. at 303 (quotation omitted). "The objective standard is required in the interests of ensuring justice in the individual case and maintaining public confidence in the integrity of the judicial process which depends on a belief in the impersonality of judicial decision making." *Id.* (quotation omitted). "The test for an appearance of partiality is whether an objective, disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case." *Id.* (quotation omitted).

Additionally, the Code of Judicial Conduct requires a judge to disqualify himself whenever "the judge has a personal bias or prejudice concerning a party or a party's lawyer." SUP. CT. R. 38, Canon 3E(1)(a). This rule requires the judge to examine whether or not he *has* a personal bias, which is a subjective standard, rather than an appearance of bias, which is an objective standard.

After reviewing Judge Lynn's order on Tapply's motion for judicial disqualification we conclude that the court applied the correct standards. While Tapply is correct that the order includes a statement about the court's own subjective view, this was required under Canon 3(E)(1)(a). The court went on to address the objective standard regarding the appearance of bias, finding, "Under all the circumstances, the court is convinced that an objective, disinterested observer, fully informed of the facts, would not entertain significant doubt as to the court's impartiality or its ability to do justice in this case." Because Judge Lynn applied the correct standards in reviewing Tapply's motion for judicial disqualification, we do not find error.

III

Finally, Tapply argues that communications between Howard Zibel, general counsel for the New Hampshire Judicial Branch, and Judge Lynn

constituted *ex parte* communications in violation of the Code of Judicial Conduct and that Judge Lynn erred in not granting her motion for disqualification.

On January 12, 2010, Tapply and her lawyer testified in front of a committee of the New Hampshire legislature in support of House Bill 1156, a bill clarifying the factors considered by a court in determining the best interest of the child in parenting cases. Zibel was present at the committee hearing. Following Tapply's testimony regarding her alleged mistreatment during her parenting case, Zibel decided to look into how the court system had handled Tapply's case. Zibel assumed the case was in the Family Division and asked the administrative judge for the Family Division, Judge Edwin Kelly, at a January 14, 2010 meeting of the Judicial Branch Administrative Council if he was aware of a case involving someone named Tapply. Judge Lynn, who as chief justice of the superior court was a member of the Administrative Council, was present at the time. Judge Lynn responded that the case was in Hillsborough County Superior Court and that he had written a lengthy order in the case. This information was relayed to a state representative, who then emailed Zibel on February 1, 2010, asking if he had the records in a "case Judge Lynn presided over," pertaining to testimony before the committee on the bill.

At some point between January 14 and February 1, Zibel asked Judge Lynn in a telephone conversation whether the Tapply file was a public file. Judge Lynn responded that it was and that he had issued a subsequent order in the case. On February 2, 2010, Zibel had another phone conversation with Judge Lynn on a different matter, and at the conclusion of the conversation asked whether his recent order in the Tapply case had been issued. Judge Lynn responded that he was unsure whether the clerk's office had sent the order out and then briefly described the second order.

Zibel then contacted the clerk of the superior court and asked to have the orders in the Tapply case faxed to him. On February 4, 2010, Zibel formally filed the two orders he received from the superior court with the House Children and Family Law Committee for inclusion in the file on HB 1156.

■ Canon 3B(7) of the Code of Judicial Conduct states that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding" absent one of the limited enumerated exceptions. SUP. CT. R. 38, Canon 3B(7) (amended 2011). "*Ex parte* communications are those that involve fewer than all of the parties who are legally entitled to be present during the discussion of any matter." J. ALFINI & a., JUDICIAL CONDUCT AND ETHICS § 5.02, at 5-2 (4th ed. 2007).

■ The test for recusal is an objective one, that is, whether an objective, disinterested observer, with knowledge of all the facts, would entertain significant doubt that justice would be done in the case. *Blackden*, 154 N.H. at 456. "[T]he mere fact that a judge received a communication pertaining to a matter without proper notice being afforded to all parties does not, standing alone, create any reasonable basis for questioning the judge's impartiality." R. FLAMM, JUDICIAL DISQUALIFICATION § 14.3, at 379 (2d ed. 2007). Judicial disqualification is required when "the judge's impartiality might reasonably be questioned." SUP. CT. R. 38, Canon 3E(1).

■ Whether or not an *ex parte* communication requires the disqualification of the judge who either initiated or received it largely depends on the extent and nature of the communication; the circumstances under which it was made; what the judge did as a result; whether the *ex parte* communication adversely affected a party who has standing to complain; and whether there is reason to believe that the judge has relied on the improper communication. FLAMM, *supra* § 14.3, at 379-80. Further, if *ex parte* communications concern only scheduling or other types of purely housekeeping matters and do not involve discussion of the merits of any issue in the case, they do not evidence a biased state of mind. *Id.* § 14.3, at 383-84.

■ Even assuming that the communications between Zibel and Judge Lynn constituted *ex parte* communications, they do not rise to a level requiring judicial disqualification. All of the communications between Zibel and Judge Lynn concerned the fact that the judge was presiding over the Tapply case and that he had issued orders in that case. The sole purpose of the communications, initiated by Zibel, was to obtain copies of the orders to provide to the House Children and Family Law Committee. There is no evidence, nor does Tapply contend, that the communications involved a discussion of the merits of any issue in the case, that the communications adversely affected her case, or that Judge Lynn, in any way, relied upon these communications in making his rulings. After a thorough review of the record we cannot say that Judge Lynn erred in denying Tapply's motions for recusal and judicial disqualification as a result of the communications with Zibel.

*Affirmed.*

DALIANIS, C.J., concurred; BROCK, C.J., retired, specially assigned under RSA 490:3, concurred.