NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

7th Circuit Court–Rochester Family Division
Nos. 2013-0411
     2014-0503


IN THE MATTER OF DIANA WOLTERS AND JOHN WOLTERS

Argued: April 9, 2015
Opinion Issued: September 15, 2015

Sulloway & Hollis, PLLC, of Concord (Patrick J. Sheehan on the brief and orally), for the petitioner.


Primmer Piper Eggleston & Cramer PC, of Manchester (Doreen F. Connor on the brief and orally), for the respondent.

CONBOY, J. In these consolidated appeals, the petitioner, Diana Wolters, and the respondent, John Wolters, appeal orders of the Circuit Court in their divorce proceeding. The petitioner argues that the original trial judge erred by denying her motion to recuse the trial judge and to vacate all orders issued by her, and erred by considering tax consequences when determining the value of the parties' property. The respondent contends that the subsequent trial judge erred by denying his motion to dismiss the petitioner's motion to correct property distribution and by awarding a certain percentage of eminent domain litigation proceeds to the petitioner. The petitioner cross-appeals, arguing that the court erred by not awarding her a greater percentage of the eminent domain litigation proceeds. We affirm in part, vacate in part, and remand.

I.      Motion to Recuse

        The petitioner argues that the original Trial Judge (Sadler, J.) erred by not recusing herself earlier in the case and, later, by declining to vacate all prior orders issued by her.  The respondent counters that the petitioner waived her recusal argument because she did not timely raise it, but that even if she did not waive this argument, there was no basis for recusal.  Assuming, without deciding, that the petitioner did not waive her recusal argument, but see Fam. Div. R. 1.10, we conclude that the original trial judge was not required to recuse herself from this case.

        Following nine days of hearings, the original trial judge granted the parties a divorce based upon irreconcilable differences and issued a lengthy and detailed final order.  Twelve days later, the petitioner requested that the judge recuse herself and vacate all prior orders.  She argued that the judge was required to disclose that an attorney from the same law firm as the attorney representing the petitioner had signed a document on behalf of the judge's former spouse in the judge's separation action.  She asserted that the judge's failure to disclose this connection warranted disqualification under Rule 2.11 of the Code of Judicial Conduct and required the judge to vacate all prior orders.  See Sup. Ct. R. 38, Canon 2.11(A).

        The judge denied the motion, stating that "she neither held any bias, lack of objectivity or lack of impartiality toward" the petitioner or her counsel, nor was there any evidence from an objective standpoint of bias or partiality.  The judge did, however, recuse herself from any future proceedings.  Following the judge's recusal, the case was transferred to a Marital Master (Foley, M.).  Upon reconsideration of the final divorce order, the marital master recommended, and the Circuit Court (Ashley, J.) approved, amendments to the final divorce decree that are not relevant to this appeal.

        The petitioner argues that the original trial judge erred by not disqualifying herself at the inception of the case.  The Code of Judicial Conduct requires a judge to disqualify herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which "[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer."  Sup. Ct. R. 38, Canon 2.11(A)(1).  "The party claiming bias must show the existence of bias, the likelihood of bias, or an appearance of such bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of a party."  In the Matter of Tapply & Zukatis, 162 N.H. 285, 297 (2011) (quotation omitted).  "The test for the appearance of partiality is an objective one, that is, whether an objective, disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case."  Id. (quotation omitted).

Here, the petitioner argues that the judge's impartiality could reasonably be questioned because when the judge "began hearing this case . . . her own divorce matter was still pending" and the judge's former "spouse was represented at one point during the process by an attorney of the same firm representing [the petitioner] in this matter." As a result, she contends that the judge should have initially disqualified herself from this case or, at a minimum, disclosed the potential conflict to the parties.

The petitioner, however, mischaracterizes the nature of the relationship between the trial judge's former spouse and the attorney practicing in the same law firm as the petitioner's attorney. Although the petitioner contends that the attorney "represented" the judge's former spouse, it appears from the record that the attorney merely signed as a "[c]onsultant" for the judge's former spouse on the uncontested final decree for separation. Beyond this one notation on the judge's final separation decree, there is no evidence that the attorney participated in the judge's separation proceedings or had any direct or indirect communication with the judge in that matter.

The petitioner contends that, because of the "human element, divorce and other family law cases can be notoriously contentious" and, "here, the trial judge's own case was so close in time and the matter so personal to her as to make the appearance of conflict unavoidable." We are not persuaded that the facts of this case would cause a reasonable person to question the judge's impartiality. There is no evidence that the judge's separation was "notoriously contentious." Indeed, it appears that the judge and her former spouse filed a joint petition for legal separation and agreed upon the terms of the final decree. Cf. Rinden v. Marx, 116 N.H. 58, 60 (1976) ("[I]t can hardly be thought that a lawyer judge would entertain animosity toward a lawyer for bringing a suit."). In addition, it appears that the judge's uncontested final petition for separation was signed approximately seven months before the judge was assigned to this case. Moreover, the petitioner has not cited any facts, nor have we found anything in the record, suggesting that the judge was personally biased against the petitioner or her attorney. See Tapply & Zukatis, 162 N.H. at 300 (finding nothing in the rulings of the court to suggest personal bias or partiality against party or party's attorney where party and her attorney had filed grievances against judge and judge had noted that he was skeptical of the party's claims).

Based upon these circumstances, we conclude that, objectively viewed, no reasonable person would question the judge's partiality in this case. Thus, the trial court did not err by not initially recusing herself from this case.

Nonetheless, relying upon Blaisdell v. City of Rochester, 135 N.H. 589 (1992), the petitioner maintains that, having failed to inform the parties of the potential conflict, the original trial judge should have "vacat[ed] any orders issued by her, as well as any subsequent orders." We disagree. In Blaisdell, we cautioned that it is the judge's responsibility to disclose, sua sponte, all

3

information as to any potential conflict between herself and the parties or their attorneys when her impartiality might reasonably be questioned. Blaisdell, 135 N.H. at 593. There, because we concluded that a judge improperly failed to recuse himself in an earlier case despite the "appearance of partiality [that] permeat[ed] the proceeding," we vacated orders in two later cases based upon the "pervasive appearance of partiality in the original case." Id. at 594. Here, however, we have found that the judge's impartiality could not be reasonably questioned. Accordingly, our decision in Blaisdell has no application in this case, and we conclude that the trial judge did not err by declining to vacate all of her prior orders.

To the extent that the petitioner argues that the original trial judge erred by ruling upon her motion for reconsideration regarding the recusal issue after the judge had recused herself from further proceedings, we decline to vacate her order denying that motion. As explained above, the original trial judge's impartiality could not reasonably be questioned. Thus, even assuming that it was error for the judge to rule upon the petitioner's motion for reconsideration, see Douglas v. Douglas, 143 N.H. 419, 428 (1999) (noting that "as a general rule, a trial judge who has recused himself [or herself] should take no other action in the case except the necessary ministerial acts to have the case transferred to another judge" (quotation omitted)), the error was harmless. See McNair v. McNair, 151 N.H. 343, 354-55 (2004) (employing harmless error standard to determine whether judge's order after recusal may stand).

II.     Tax Liabilities/Consequences

The petitioner next argues that the trial court erred by reducing the value of some of the parties' properties, which primarily consist of limited liability corporations, to account for potential taxes that would result from a sale or transfer of the properties. She maintains that, because the trial court neither ordered a sale or transfer of the properties nor had any evidence that the parties intended to sell or transfer the properties, the trial court's consideration of such tax consequences constituted impermissible "speculation about a party's future use of an asset" contrary to In the Matter of Telgener & Telgener, 148 N.H. 190 (2002).

In a divorce proceeding, the trial court is given discretion in determining the value of any given asset, In the Matter of Chamberlin & Chamberlin, 155 N.H. 13, 16 (2007), and "the equitable distribution of the marital estate," Telgener, 148 N.H. at 191 (quotation omitted). Absent an unsustainable exercise of discretion, we will not overturn its decision in matters involving alimony and property distribution. Telgener, 148 N.H. at 191.

We begin by reviewing our decision in Telgener. In Telgener, the respondent argued that the trial court erred by failing to consider tax consequences when distributing the parties' marital assets. Id. at 190. He

4

maintained that he would be forced to incur substantial tax penalties as a result of the court's distribution scheme. Id. at 191. He argued that the trial court committed legal error because it was aware that he desired to purchase a new home and was aware of the difficulty he would face in financing that purchase, yet it failed to consider that to secure financing, he would be forced to liquidate some of his tax-deferred retirement accounts and incur substantial tax penalties. Id. Thus, the respondent contended that, because the trial court failed to consider these supposed reasonably foreseeable tax consequences, the distribution of marital property was unequal, inequitable, and injurious. Id. at 191-92.

In accord with the decisions of other courts, we held that, when valuing marital assets for the purpose of distribution, a trial court may consider potential tax consequences to the parties only if a taxable event, such as a sale or other transfer of property, is required by the property distribution, or is certain to occur shortly thereafter. Id. at 192. In contrast, where there is merely a likelihood or a possibility that a taxable event will occur, a court may not reduce the value of an asset by uncertain tax consequences. Id.

Because, in that case, the respondent's testimony was insufficient to show that the tax liability was reasonably ascertainable, we ruled that consideration of a tax consequence would have been improper as it would have required the trial court to speculate regarding the respondent's future dealings with his retirement funds. Id. at 193. We, therefore, concluded that, because the withdrawal of the retirement funds was neither required by the court's order nor certain to occur within a short time after the divorce decree, the court did not err when it declined to reduce the value of the respondent's retirement funds to account for tax consequences to the respondent of early withdrawal. Id.

In this case, in assigning a value to each of the parties' marital assets, the trial court found that "tax debt due to the IRS in respect to the particular pieces of property is relevant to the overall value." The court explained that "[t]hese debts, according to the evidence[,] will not go away. If and when the properties are transferred to a third party the debt will be due and will remain an attachment to the properties until satisfied." As a result, the court found that "the debt for taxes has a bearing on the overall value of the properties and will be considered in respect to the property distribution." The trial court then reduced the value of certain properties by such "tax debt" in its distribution of marital assets.

A review of the record indicates that the "tax debt" referred to by the trial court consists of taxes, including capital gains taxes, that would be due upon a sale or transfer of the property. At trial, the parties' certified public accountant, called as a witness by the respondent, provided evidence as to the estimated potential tax liabilities resulting from a hypothetical sale or

5

foreclosure of the properties. He prepared a spreadsheet depicting the parties' deferred tax obligation with respect to the properties. He testified that, if the properties are separated "in kind," there are deferred tax liabilities associated with certain properties that would remain with those properties and that the party who was awarded the property would be responsible for those taxes upon sale or any event that would cause the companies to be liquidated. He explained that he calculated the total potential "recapture tax on sale" of the properties based upon estimated tax rates for capital gains and depreciation recapture.

As in Telgener, however, the trial court's order does not require a sale or liquidation of the parties' properties or LLCs, nor does it appear from the record that a sale or liquidation was certain to occur within a short time after the divorce decree. Indeed, the respondent acknowledges, "If the Court ordered a liquidation, the foregoing taxes would have to be paid" but the court "did not order a liquidation forcing the payment of these taxes because liquidation [would leave] the parties insolvent." The trial court itself stated that the debt will be due on the properties "[i]f and when the properties are transferred to a third party." (Emphasis added.) The parties' accountant testified that the estimated potential tax liabilities set forth on his spreadsheet constitute "an accounting of the taxes that will be paid if the properties are either sold or foreclosed upon" and agreed with the petitioner's counsel that "these taxes are [not] currently owed." Thus, to the extent that, in valuing the marital property for distribution, the trial court considered estimated tax liabilities of the parties due upon a future sale of the properties, it necessarily speculated as to the parties' future dealings with the properties. This was error. See Telgener, 148 N.H. at 192-93; see also Schuman v. Schuman, 658 N.W.2d 30, 36-37 (Neb. 2003) (concluding that trial court erred by considering tax consequences of sale of business in valuing marital property when "there was no evidence that the business was going to be sold in the near future"); In re Marriage of Hay, 907 P.2d 334, 336 (Wash. Ct. App. 1995) (determining that trial court erred by considering "capital gains tax consequence[s] when valuing the parties' interest in the real estate partnership" because sale was not imminent and did not directly arise from distribution of property).

Nonetheless, relying upon Rattee v. Rattee, 146 N.H. 44 (2001), the respondent contends that the trial court properly took into account accrued tax liabilities in determining the fair market value of the parties' properties. Rattee dealt with the valuation of stock in a closely held corporation. Rattee, 146 N.H. at 50. We held that the trial court did not err by applying a discount to the "fair value" of the parties' shares in the company to arrive at their fair market value. Id. at 51 (quotation omitted). The respondent is correct that, in Rattee, we stated that the fact that an actual sale of the defendant's interest in the company was not contemplated at the time of the final hearing was irrelevant to "the concept of the fair market value" of the stock in the corporation. Id.

Because <u>Rattee</u> addressed an issue different from that addressed in <u>Telgener</u>, the holdings in the two cases do not conflict.

As we observed in <u>Rattee</u>, "[f]air market value is the price a willing buyer and a willing seller would probably arrive at through fair negotiations, taking into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining." <u>Id</u>. at 50 (quotation omitted). <u>Rattee</u> necessarily involved consideration of the stock price a <u>willing buyer and seller</u> would agree upon. <u>Id</u>. By contrast, <u>Telgener</u> involved the potential future tax consequences <u>to the parties</u> resulting from a sale or other disposition of the property. <u>Telgener</u>, 148 N.H. at 192-93. Although such potential tax consequences are relevant to the valuation of the property for distribution purposes if those consequences are the result of the court's order or are certain to occur within a short time after the divorce decree, they are not relevant to the ascertainment of present fair market value of marital property. <u>See</u> <u>Clark v. Clark</u>, No. M2006-00934-COA-R3-CV, 2007 WL 1462226, at *4 (Tenn. Ct. App. May 18, 2007) ("[T]he fair market value of a marital asset is separate and distinct from the tax implications of its sale."); <u>Johnson v. Johnson</u>, 605 A.2d 857, 860 (Vt. 1992) ("[T]he tax status of assets in the hands of one of the parties should not affect their fair market valuation, unless the [divorce] decree necessitates their sale."); <u>Arbuckle v. Arbuckle</u>, 470 S.E.2d 146, 147, 148 (Va. Ct. App. 1996) (holding that trial court erred by discounting value of dental practice by estimated capital gains taxes "resulting from a hypothetical sale" because those consequences were too speculative to be considered, and, thus, not based upon present fair market value of property).

Thus, if the evidence establishes that potential future tax liability reasonably affects the fair market value of a marital asset — that is, the price that a willing buyer would pay a willing seller to purchase a particular asset — the trial court may consider that liability in determining the present fair market value of the asset. However, the value of an asset may not be reduced to reflect the potential tax consequences <u>to the parties</u> resulting from the sale or transfer of the asset after distribution, unless the sale or transfer is required by the court's order or is certain to occur shortly thereafter. <u>Telgener</u>, 148 N.H. at 192-93; <u>see</u> <u>Johnson</u>, 605 A.2d at 860.

The respondent contends that <u>Telgener</u> is "factually and fundamentally distinguishable from this case [because] it involved unknown, speculative personal tax liabilities as opposed to ascertained and accrued commercial LLC tax debt." The respondent maintains that our concern in adopting the rule in <u>Telgener</u> was with the speculative nature of the tax liabilities and, here, "[t]he amount of the [parties'] commercial LLC's accrued and deferred tax debt was not speculative and it was verified by uncontested testimony as of the date of trial."

7

This argument, however, fails to take into account that our holding in Telgener did not merely require that the amount of the potential taxes be reasonably ascertainable. We held that tax consequences to the parties may be considered only if a taxable event is required by the property distribution or is certain to occur shortly thereafter. Telgener, 148 N.H. at 192. Simply because there was evidence in this case of a reasonably ascertainable amount of potential tax liability does not, by itself, allow the trial court to consider such consequences in its distribution of marital property. As we explained in Telgener, "[c]onsideration of a tax consequence is precluded . . . when the trial court must speculate as to a party's future dealing with the property." Id. (emphasis added). This reasoning is in accord with the decisions of other courts. See Harmon v. Harmon, 962 A.2d 959, 962-63 (Me. 2009) (concluding that court did not err in not considering tax implications of selling marital property where wife had not expressed intent to sell property and court did not order sale of property); In re Marriage of Haberkern, 85 P.3d 743, 746-47 (Mont. 2004) (concluding court abused its discretion by considering tax consequences when value of retirement account and tax laws at liquidation were unknown and court did not know when sale would occur); Conzemius v. Conzemius, 841 N.W.2d 716, 722-23 (N.D. 2014) (finding court did not err in not considering future tax consequences of property division because wife did not identify plans to retire or to withdraw funds from pension plan "within a short time" (quotation omitted)); Drumheller v. Drumheller, 972 A.2d 176, 191 (Vt. 2009) (finding no error in court's decision not to adjust value of properties by tax liabilities that would result upon sale because record did not demonstrate that husband would have to sell properties).

The respondent further contends that this case is akin to In the Matter of Thayer and Thayer, 146 N.H. 342 (2001), and maintains that "[i]n essence, the unpaid tax liability is an advance on the marital estate that the parties have already received" and, because "[b]oth parties had [the] benefit of the tax deferred income, . . . it would be grossly inequitable if only one party post-divorce was required to pay essentially all of the taxes that went unpaid during the parties' decades of marriage." Thayer, however, is distinguishable. Thayer dealt with whether certain debt was properly deemed "family" debt subject to distribution as part of the marital estate. See Thayer, 146 N.H. at 346-47. Thus, unlike this case, Thayer did not involve consideration of potential future tax consequences to the parties resulting from the trial court's distribution of the marital estate.

We conclude, therefore, that, because sale or transfer of the properties at issue was neither required by the trial court's order, nor certain to occur within a short time after the divorce decree, the trial court erred to the extent that, when valuing the properties for distribution, it reduced the value of those properties to account for estimated taxes that would be due by the parties in the event of a sale or transfer of the properties. Accordingly, we vacate the trial

court's distribution order and remand for distribution of assets consistent with this opinion.

### III.     Eminent Domain Litigation Proceeds

Finally, the respondent argues that the Circuit Court (Foley, J.) erred by denying his motion to dismiss the petitioner's motion to correct property distribution, in which she sought to amend the property distribution to account for proceeds obtained from eminent domain litigation regarding one of the parties' properties, and erred by thereafter reallocating the proceeds. In the final decree, the trial court found that the respondent had initiated an action contesting the amount of compensation received from the State of New Hampshire pursuant to an eminent domain action regarding one of the parties' properties. Because the court found that the petitioner had little, if any, role in the litigation, the court awarded any net proceeds from the action to the respondent as "an offset of the difference in asset distribution between the parties."

After the petitioner filed her appeal in this case, a jury returned a substantial verdict in the eminent domain litigation. The petitioner then moved for partial remand and to stay the appellate process, requesting that we remand the case to the trial court to amend the property distribution to account for the proceeds. We stayed the petitioner's appeal and remanded to the trial court. Upon remand, the trial court found that "strict application" of the divorce decree would be inequitable and, therefore, it amended the property distribution by awarding 20 percent of the net proceeds from the eminent domain litigation to the petitioner and the balance to the respondent.

On appeal, the respondent argues that the petitioner failed to preserve her challenge to the award from the eminent domain litigation and, therefore, the trial court lacked jurisdiction to modify the property distribution. He further contends, however, that even if the court had jurisdiction, it erred by allocating 20 percent of the proceeds to the petitioner. The petitioner cross-appeals, arguing that the trial court properly exercised its jurisdiction, but that it should have awarded her a greater percentage of the proceeds. Because we have vacated the trial court's entire property distribution, we need not address these arguments at this juncture.

Affirmed in part; vacated in part; and remanded.

DALIANIS, C.J., and LYNN and BASSETT, JJ., concurred.

9